IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHARLES K. BRELAND, JR. et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   CIVIL ACTION NO. 14-00158-CG-C |
| | ) |
| LEVADA EF FIVE, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**ORDER**

This matter is before the Court on the Motion for Partial Summary Judgment (Doc. 97), Brief in Support (Doc. 98), and Evidentiary Submissions in Support (Doc. 99), filed by Levada EF Five, LLC ("Defendant"), and the response (Doc. 103) filed by Charles K. Breland, Jr. ("Breland"), Osprey Utah, LLC ("Osprey"), Water Canyon Holdings, LLC ("Water Canyon"), Range Creek Holdings, LLC ("Range Creek"), and Utah Reverse Exchange, LLC ("Utah Reverse") (collectively, "Plaintiffs"). For the reasons set forth herein, Defendant's motion for partial summary judgment is due to be **DENIED**.

**I. BACKGROUND**

The instant action is based on Plaintiffs' allegations Defendant breached the Amended and Restated Agreement ("the Agreement") entered into between the parties. (Doc. 50). Before discussing the relevant provisions of the Agreement and facts surrounding the alleged breach, it is necessary to discuss how the Agreement

came to be.

Plaintiffs Osprey, Water Canyon, Range Creek, and Utah Reserve have one thing in common; Breland is the sole member of each limited liability company. On March 11, 2009, Breland filed for protection under Chapter 11 of the United States Bankruptcy Code. Id. at ¶ 12. In order to reorganize under Chapter 11, a reorganization plan was filed with the bankruptcy court (Doc. 1-1) and approved (Doc. 1-2).[1] In order to fund the plan, Breland negotiated with Adrian Zajac to transfer his interest in Utah Reserve, Water Canyon, and Range Creek to Defendant. (Doc. 50, ¶ 14; Doc. 98, pp. 2–3). Said interest included property located in Carbon and Emery Counties, Utah and consisted of approximately 20,676 acres of land. Id. In exchange for the transfer, Defendant agreed to payoff a collateral agreement between Breland and Cypress Capital (hereinafter, "Cypress Litigation"). Breland and Defendant memorialized the Agreement on May 2, 2011. (Doc. 99-2; Doc. 103-1).

In the instant matter, three provisions of the Agreement are in dispute. First, section eight of the Agreement requires Defendant to invest $10,000,000 in the exploration or development of mineral production on the Subject Property, unless performance is excused by the force majeure provision. Id. at 8. To date, Defendant has not invested $10,000,000 in the property. (Doc. 103-18, p. 169:8–10). Second, section twelve of the Agreement requires Defendant to pay up to $1,750,000 to

---

[1] Ohana Cabo LLC ("Ohana") filed the amended plan. Ohana was a party interested in purchasing a portion of Breland's assets but has no relative bearing on the instant matter and is not discussed further.

settle the Cypress Litigation. (Doc. 99-2, pp. 12–13; Doc. 103-1, pp. 11–12). In the event the Cypress Litigation settles for more than $1,750,000, Defendant can, but has no obligation to, pay the additional sum. Id. But if the Cypress Litigation "settlement or judgment amount equals less than $2,900,000, [Defendant] shall pay Breland $90,000 to cover reasonable attorneys' fees and expenses incurred by Breland." (Doc. 99-2, pp. 15–16; Doc. 103-1, pp. 14–15). Ultimately, the Cypress Litigation settled for approximately $3.8 million. (Doc. 98, p. 9; Doc. 103, p. 6). Third, section fifteen of the Agreement obligated Defendant to pay the outstanding property taxes for 2008, 2009, 2010, and 2011 and any future property taxes for the property. (Doc. 99-2, p. 15; Doc. 103-1, p. 14). Breland paid a portion of the property taxes, due to Defendant's failure to pay from the second half of 2011 on. (Doc. 98, p. 5).

Presently, Defendant avers that it is due judgment as a matter of law because (1) it owes no money to Breland due to the Cypress Litigation judgment equaling an amount greater than $2,900,000; (2) Breland can prove no damages caused by the property taxes he paid; and (3) it was excused from development of the Subject Property by December 31, 2014 due to the force majeure clause. (Doc. 98, p. 2). The Court will address each argument in turn.

## II. ANALYSIS

### A. The Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." The trial court's mission is to "determine whether there is a genuine issue for trial" and not to "weigh the evidence." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The burden is on the moving party to show that there is no genuine dispute as to any material fact. Id. at 256. In conducting its summary judgment analysis, the Court must construe all evidence "in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

After the movant meets its burden, the burden shifts to the nonmoving party "to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the nonmoving party fails to do so, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Further, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks omitted). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B. Settlement of the Cypress Litigation

It is undisputed that the collateral litigation was settled for approximately

4

$3.8 million. The parties disagree on whether Defendant was obligated to settle the litigation for a much lower amount and whether Defendant owes attorney's fees to Breland. The pertinent portion of the Agreement states:

> 12. <u>Cypress Litigation</u>. In consideration of the conveyance to Levada of the Subject Property, the Leases and the Questar Agreements, Levada shall pay the sum that is acceptable to Levada and Cypress Capital II ("Cypress"), to Cypress in order to settle the Litigation so the Subject Property will be free and clear of any liens and/or encumbrances created in connection with the Litigation and the subject matter thereof at the time the Subject Property, the Leases and the Questar Agreements are conveyed to Levada. Levada shall pay up to $1,750,000, but shall have no obligation to pay Cypress any sum in excess of $1,750,000 to settle the Litigation, but may pay in excess of that amount if it deems it necessary to settle the Litigation. . . .
>
> . . .
>
> 17. <u>Legal Fees</u>. If, on the Closing Date, the Cypress settlement or judgment amount equals less than $2,900,000, Levada shall pay to Breland $90,000 to cover reasonable attorneys' fees and expenses incurred by Breland and his affiliates in connection with the Litigation. Breland and Osprey warrant that the LLCs shall not have any obligation to pay attorneys' fees and expenses in connection with the Litigation. Breland shall provide copies of its invoices for attorneys' fees and expenses to Levada. If the Cypress Settlement or Judgment amount exceeds $2,900,000, Levada has no obligation to reimburse Breland's attorneys' fees and expenses incurred in connection with the Litigation.

(Doc. 99-2, pp. 12–13, 15–16; Doc. 103-1, pp. 11–12, 14–15). Defendant argues that "no payment is due Breland for attorney's fees under the Agreement, and there was no breach of the Agreement," because "the collateral action was settled for $3,855,556.55 and in excess of the $2,900,000 threshold in the Agreement." (Doc. 98, p. 9). Plaintiffs counter that "Defendant failed to settle the litigation for an appropriate amount when it had the opportunity to do so." (Doc. 103, p. 5). Specifically, Plaintiffs claim that Defendant had the opportunity to settle the

5

litigation for less than the $2.9 million threshold, was required by the language of the Agreement and the duty of good faith to do so, and thus owes attorney's fees to Breland pursuant to section seventeen of the Agreement. Id. at 5–8.

The Agreement provides that Utah law governs the contractual relationship. (Doc. 99-2, p. 16; Doc. 103-1, p. 15). When interpreting a contract, a court must "first look to the four corners of the agreement to determine the intentions of the parties." Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist, 773 P.2d 1382, 1385 (Utah 1989). Barring ambiguity, "the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." Cent. Fla. Invs., Inc. v. Parkwest Assocs., 40 P.3d 599, 605 (Utah 2002). If ambiguous language is present, "extrinsic evidence must be looked to in order to determine the intentions of the parties." Id. In that case, the interpretation of the contract is no longer a matter of law but a question of fact, precluding the court from granting a motion for summary judgment. See Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983). A contract term is ambiguous "when it is reasonably capable of being understood in more than one sense." R&R Energies v. Mother Earth Indus., Inc., 936 P.2d 1068, 1074 (Utah 1997) (quoting Black's Law Dictionary 73 (5th ed. 1979)). Further, "[t]o demonstrate ambiguity, the contrary positions of the parties must each be tenable." Plateau Mining Co. v. Utah Div. of State Lands & Forestry, 802 P.2d 720, 725 (Utah 1990).

Scant evidence was submitted by either party relevant to this claim. Defendant's representative, Adrian Zajac, states in his deposition that Defendant

settled the litigation for approximately $3.8 million after a judgment was entered against Plaintiffs. (Doc. 99-8, p. 9; Doc. 103-20, p. 3). However, Breland asserts in his affidavit that Defendant refused to take the opportunity to settle the litigation for $1.29 million, an amount much lower than both the Agreement threshold and the resulting litigation settlement. (Doc. 103-2, p. 1).

As shown above, the Agreement states, "Levada shall pay the sum that is acceptable to Levada and Cypress . . . to Cypress in order to settle the Litigation," and "Levada shall pay up to $1,750,000, but shall have no obligation to pay Cypress any sum in excess of $1,750,000 to settle the Litigation, but may pay in excess of that amount if it deems it necessary to settle the Litigation." When read together, it is reasonable to interpret the Agreement as providing Defendant with significant leeway in determining the amount of the settlement. However, it is also reasonable to read "Levada shall pay up to $1,750,000" as requiring Defendant to settle the litigation for an amount of $1.75 million or less should the opportunity arise. If the former is the correct interpretation, then by the plain language of the Agreement Defendant is relieved of paying Breland the attorney's fees. On the other hand, if the latter is the true intent of the parties, then Defendant potentially breached the Agreement. Either interpretation is tenable, and thus by law the provision is ambiguous. Extrinsic evidence is needed to determine the intent of the parties, preventing this Court from granting summary judgment to Defendant. Therefore, Defendant's motion must be denied on this issue.

### C. The Failure of Defendant to Pay Property Taxes

It is undisputed that Breland paid some of the property taxes after the first half of 2011 upon Defendant's failure to do so. The parties disagree as to whether Defendant's failure to pay constitutes a breach of the agreement. The Agreement states in relevant part:

> 15. <u>Property Taxes</u>. Levada will be responsible for and pay all taxes (existing outstanding property taxes for 2008, 2009, 2010, and 2011), and future property taxes against the Subject Property. Levada and Osprey will be responsible for filing state and federal income tax returns and payment of each of their respective income taxes.

(Doc. 99-2, p. 15; Doc. 103-1, p. 14). Breland asserts in an affidavit that he has paid property taxes totaling "approximately $80,000" beginning with the second half of 2011 (Doc. 103-2, p. 4), and a representative of Defendant admitted as much in his deposition (Doc. 99-8, p. 7; Doc. 103-20, p. 1).

The elements of a breach of contract claim in Utah are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." <u>Bair v. Axiom Design, LLC</u>, 20 P.3d 388, 392 (Utah 2001). The thrust of Defendant's main argument is that Plaintiffs were not harmed by Defendant's failure to pay the property taxes. (Doc. 98, pp. 9–10). Defendant's brief contains only one citation to a single authority to support this contention. <u>Id.</u> Defendant cites to <u>Eleopulos v. McFarland & Hullinger, LLC</u>, 145 P.3d 1157, 1160 (Utah Ct. App. 2006), for the argument that, "although there exists a possibility, even a probability, of future harm, it is not enough to sustain a claim, and a plaintiff must wait until some harm manifests itself to establish a breach of contract action." (Doc. 98, pp. 9–10) (internal quotation marks omitted). Defendant's reliance on this case is not well-taken.

8

In Eleopulos, the plaintiffs sued the defendant for "expert and site-study fees," expenditures made due to suspected pollution of the plaintiffs' land by the defendant. Eleopulos, 145 P.3d at 1158. The court of appeals found that the fees were "expenses incurred in preparation for trial and . . . not recoverable as damages" for the plaintiffs' breach of contract claim. Id. at 1160.

Here, Breland's paying of the taxes was not in preparation for trial. Nor was his payment based on speculation that he could be harmed by Defendant's failure to pay the taxes on the property. The consequences of tax delinquency are real and certain. It appears from the plethora of documents submitted to the Court that Breland retained some sort of interest in the property that would be in peril should the government place a lien on the property or sell the land for payment of back taxes. In fact, Breland might have violated Utah's duty to mitigate damages had he allowed the property to suffer from Defendant's neglect. See Angelos v. First Interstate Bank of Utah, 671 P.2d 772, 777 (Utah 1983) ("The doctrine of avoidable consequences, also referred to as mitigation of damages, generally operates to prevent one against whom a wrong has been committed from recovering any item of damage arising from the wrongful conduct which could have been avoided or minimized by reasonable means."). Viewing the facts in the light most beneficial to Plaintiffs as the non-moving party, it is apparent that Plaintiffs have likely suffered damages at least in the amount of the tax payment. Thus, Defendant's main argument pertaining to the tax payment fails.

Perhaps Defendant's failure to pay the property taxes was due to a lack of

notification by Breland, as Defendant alleges. (Doc. 98, p. 5; Doc. 103-20, pp. 9–10). The Utah Supreme Court has previously held that the failure to pay property taxes did not constitute a breach of contract when the seller never notified the buyer of the taxes, but the contract in that case provided for a contingency in which the seller elected to pay the property taxes. See Madsen v. Anderson, 667 P.2d 44, 47–48 (Utah 1983). There is nothing in the agreement here that would indicate any such arrangement, and the Court is unwilling to make the factual leap it would take to find for Defendant. While Defendant's representative asserts in a deposition that the company attempted to reimburse Breland for his payment of the taxes (Doc. 99-8, p. 7; Doc. 103-20, p. 1), Breland argues in his affidavit that there were conditions to this reimbursement imposed by Defendant (Doc. 103-2, p. 4). Although Breland appears to state in his deposition that he would not accept a no-strings-attached repayment of the taxes unless all of the issues in the case are resolved (Doc. 99-1, p. 18), there is a factual dispute as to whether this offer and rejection occurred. This disagreement is best left for decision by the fact finder.

The Court is unaware of any statute, precedent, or contract principle that requires Plaintiffs to forego paying the taxes and forfeit the land in question before gaining the ability to sue Defendant for breach. Nor has Defendant alerted the Court to any such authority. Therefore, Defendant's motion for summary judgment on this issue must be denied.

### D. The Force Majeure Clause

As a last point, the parties disagree as to whether Defendant breached its

development obligation in section eight of the Agreement. It is undisputed that Defendant failed to invest $10,000,000 in the exploration or development of mineral production of the Subject Property. Section eight of the Agreement states:

> 8. <u>Development Obligation</u>. No later than December 31, 2014, subject to a force majeure event (inability to procure funds shall not constitute a force majeure event) including, without limitation, as an additional force majeure event, any period where the 6-month moving average of natural gas is below $4.25/mmBtu, which event(s) will temporarily excuse performance during the period of a force majeure event, Levada or its affiliates or assignees shall expend or contribute and expend at least $10,000,000 for exploration or development of mineral production on the Subject Property, or commence a five well drilling program. Payments to acquire additional leases shall not be applied to the $10,000,000 exploration and development requirement. Levada shall have the option to extend this period of the exploration and development for two (2) consecutive, one-year periods following December 31, 2014 (as extended pursuant to the force majeure provisions set forth above), for two (2) one-time payments of $200,000 for each such one-year period which option shall be exercised by written notice thereof given to Osprey prior to the expiration of the initial extension period. Each such payment shall accompany such notice.

(Doc. 99-2, p. 8; Doc. 103-1, p. 7).

Defendant argues it is due judgment as a matter of law because the force majeure clause excused performance for "most of the time period between execution of the Agreement on May 2, 2011, and December 31, 2014," due to depressed natural gas prices. (Doc. 98, p. 6). Further, due to the proclaimed excused performance, Defendant maintains its development obligation is excused up to some point in 2017 or 2018, depending on the natural gas pricing index used. <u>Id.</u> at 7. On the other hand, Plaintiffs defend their claim by arguing that the development obligation clause is ambiguous. Plaintiffs assert that the only way to clarify the

11

ambiguity is to ascertain the parties' intentions through parol evidence, which is a material and conflicting issue of fact between the parties. (Doc. 103, p. 14).

In evaluating whether the development obligation clause is ambiguous, the legal standard applied in evaluating whether the Cypress Litigation clause (Section B) is ambiguous controls. For efficiency sake, it is not restated.

At first blush, the development obligation clause seems straightforward. But as Plaintiffs assert, ambiguity emerges in three aspects: (1) the natural gas index to be used, (2) computation of six-month moving average, and (3) how excused performance affects the stated deadline. (Doc. 103, pp. 14–17).

As to the natural gas index to be used, the four corners of the agreement show the force majeure clause excuses development for any period of time where the six-month moving average of natural gas is below $4.25/mmBtu. This much is clear. Who or what dictates when the price of natural gas is below $4.25/mmBtu is unclear. Defendant even concedes this point. See (Doc. 98-18, p. 171:13) (Q: Now, what standard is it of natural gas? Does it reflect what index or standard that it's tied to as the basis for the six-month moving average of natural gas? A: It does not specify a market). Notwithstanding this absence, Defendant maintains that there are "two commonly accepted indices for natural gas." (Doc. 98, p. 6). But Defendant does so in a conclusory manner without reference to binding authority. And the Court has found no binding authority supporting Defendant's position.

Conversely, Plaintiffs offer four additional natural gas indices and contend that the United Kingdom Heren NBP Index (an index not cited by Defendant) "is

typically recognized as average for the industry standard." (Doc. 103, p. 15). Plaintiffs cite the Heren NBP Index in the same conclusory manner. Based on the agreement giving no clear indication as to the index to be used and the parties' differing positions, the Court finds the Agreement ambiguous as to the natural gas index that dictates when the force majeure clause excuses development of the property.

Even though there is ambiguity, the Court must decide whether Plaintiffs' interpretation is tenable. In other words, could the price of Utah natural gas be based on an index unrelated to Utah. This question can be answered in the affirmative. Viewing the evidence in the light most favorable to Plaintiffs, the non-moving party, the fungible commodity in question could trade in numerous markets, around the world, at widely varying prices. See (Doc. 103-2, p. 3) (Breland stating he believed the natural gas would be sold internationally). This differs from, say, a unique commodity that is priced by only one index or shares of stock that are only listed on one exchange. And given the number of indexes available, to say that Defendant's cited indices are the only indices that could apply is not tenable. Therefore, because the agreement fails to identify the controlling index, extrinsic evidence is needed to determine the intent of the parties, preventing this Court from granting summary judgment to Defendant. See Faulkner, 665 P.2d at 1293 (finding summary judgment improper if a factual issue of what the parties intended is present).

The second point of potential ambiguity in the development obligation clause

concerns how the "6-month moving average of natural gas" is calculated. Such an elementary calculation becomes ambiguous with the absence of key term definitions. For instance, the contract uses the term "period" in computing the average index price but gives no definition for what makes up a period. As Defendant points out, even if mistakenly, a period may vary depending on index used. See (Doc. 98, pp. 6–7) (stating that the Platts' Questar Rocky Mountain weighted average uses a daily period and the Henry Hub index uses a weekly period). The type of period used in computing the average is material and fundamental in evaluating whether the development obligation is excused by the force majeure provision. As with the applicable natural gas index, extrinsic evidence is needed to determine the intent of the parties.

The third point of potential ambiguity in the development obligation clause is how an excused "period" of performance affects the December 31, 2014 development obligation deadline. As stated above, Defendant contends that its development obligation was "temporarily excuse[d]" and its deadline is extended to sometime in 2017 or 2018.

It is beyond dispute that the plain language of the agreement contemplates some type of extension of the development obligation deadline. There is no clear answer beyond this. As Plaintiffs point out, there is a question as to whether the excused period(s) extend(s) the development deadline day for day, week for week, etcetera or whether performance was merely excused and the December 31, 2014 deadline is in place. (Doc. 103, pp. 17–18). A good deal of this could turn on the

parties' intentions regarding the index to be used and what was intended by the terms within the development clause.

Therefore, the Court finds that the development clause is ambiguous and cannot be interpreted as a matter of law. The parties' intentions regarding the ambiguities can only be resolved through extrinsic evidence. For the Court to resolve the ambiguity would entail weighing the parties' evidence. Such an action is improper in deciding the present motion. Therefore, Defendant's motion must be denied on this issue.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Partial Summary Judgment (Doc. 97) is hereby **DENIED**.

**DONE** and **ORDERED** this 24th day of November, 2015.

/s/ Callie V. S. Granade  
UNITED STATES DISTRICT JUDGE